SIGMA FINANCIAL CORPORATION,
Plaintiff,

v.

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE CO., Prosurance Insurance Group, Rich Glenn and Associates, Inc. and Rich Glenn, Jr., Defendants.

No. 01–CV–70624–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 29, 2001.

See also, —— F.Supp.2d ——.

Barry Feldman, Birmingham, MI, for plaintiff.

Harvey Heller, Southfield, MI, Timothy Mizerowski, Farmington Hills, MI, Larry Davidson, Troy, MI, for defendant.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BORMAN, District Judge.

Now before the Court is Plaintiff's Motion for Partial Summary Judgment. The Court heard oral argument on the motion on August 22, 2001. Having considered the entire record, and for the reasons that follow, the Court GRANTS Plaintiff's Motion.

## FACTS

■ Plaintiff Sigma Financial Corporation (Plaintiff or Sigma) initially purchased a claims made errors and omissions policy of liability insurance from American International Specialty Lines Insurance Co. (AIG or Defendant) in 1993.[1] The policy was renewed annually, and it is undisputed that Plaintiff paid all necessary premiums. The policy (and its subsequent renewals) required AIG

> [t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured or of any other person for whose actions the Insured is legally responsible, but only if such Wrongful Act occurs on or after the Retroactive Date and prior to the end of the Policy Period and solely in rendering or failing to render Professional Services by or on behalf of the securities broker/dealer named in Item 1 of the Declarations to a client of such securities broker/dealer.

Policy No. 244–27–09, Pl. Exh. A, p. 1 and Policy No. 278–15–39, Pl. Exh. B, p. 1. The 1998–99 and 1999–2000 policies each had

---

1. According to the Michigan Supreme Court, "a 'discovery' or 'claims made' policy is one in which indemnity is provided no matter when the alleged error or omission or act of negligence occurred, provided the misdeed complained of is discovered and the claim for indemnity is *made* against the insurer during the policy period." *Stine v. Continental Casualty Co.*, 419 Mich. 89, 97, 349 N.W.2d 127 (1984) (emphasis in original). It should be noted, however, that the policies at issue are not true "claims made" policies since in the Special Reporting Clause they "provided coverage for claims after the policy period arising out of 'occurrences' sufficiently noticed during the policy period." *FDIC v. Interdonato*, 988 F.Supp. 1, 3 (D.D.C.1997). "A true claims made policy would only cover claims brought and sufficiently noticed during the coverage period." *Id.* at 2 n. 2.

limits of $1,000,000 ($1 million) for "Each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts," and an aggregate limit of $9,000,000 ($9 million). Policy No. 244–27–09 Pl. Exh. A and Policy No. 278–15–39, Pl. Exh. B. These policies also included an exclusion which stated:

> This policy does not apply . . .
>
> > j) to any claim arising out of the facts alleged, or arising out of the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any occurrence of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time . . . .

Policy No. 244–27–09, Pl. Exh. A, p. 4 and Policy No. 278–15–39, Pl. Exh. B, p. 3. Additionally, the policies had a limit of liability which stated:

> The limit of liability stated in the Declarations as applicable to "Each Wrongful Act or series of continuous, repeated, or interrelated Wrongful Acts" is the limit of the Company's liability for all amounts payable hereunder in settlement or satisfaction of claims, judgements or awards and Defense Costs arising out of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts, without regard to the number of Insureds, claims, demands, suits or proceedings or claimants. If additional claims are subsequently made which arise out of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts as claims already made and reported to the Company, all such claims, whenever made, shall be considered first made within the Policy Period or the extended reporting period in which the earliest claim arising out of such Wrongful Act was first made and reported to the Company, and all such claims shall be subject to one such limit of liability.

Policy No. 244–27–09, Pl. Exh. A, p. 5 and Policy No. 278–15–39, Pl. Exh. B, p. 5.

Plaintiff bought its policies through Defendant Rich Glenn and Associates, Inc. Plaintiff alleges that Defendant Rich Glenn conducted the negotiations regarding the recruitment of Sigma. At some point, Rich Glenn and Associates was purchased by Prosurance Insurance Group.[2]

Sigma sold various investment opportunities to the public, including Mortgage Company of America (MCA) product. In January of 1999, MCA failed, under circumstances involving allegations of fraud. This failure of MCA resulted in legal claims against Sigma by its customers who had purchased, *inter alia*, various MCA product from Sigma representatives. Sigma sent AIG a letter on February 24, 1999, putting AIG on notice of possible legal claims against Sigma based on the failure of MCA. AIG responded to this letter by sending Plaintiff a reservation of rights letter.

It is undisputed that individual claims were filed in both 1999 and 2000, the coverage years of the policies at issue. AIG has paid some of the settlements and expenses which resulted from these lawsuits. However, AIG refuses to pay above the $1 million limitation included in the 1999 policy, and refuses to pay any sum under the 2000 policy.

Now before the Court is Plaintiff's Motion for Partial Summary Judgment, re-

---

**2.** An extensive discussion of the relationships between these parties is not included because Plaintiff brings this motion against Defendant AIG solely. Counsel for Prosurance Insurance Group, Rich Glenn and Associates, Inc. and Rich Glenn, Jr. were present at the hearing on August 22, 2001. Counsel for Rich Glenn and Associates, Inc. and Rich Glenn, Jr. indicated that those defendants concurred in the relief sought by Plaintiff Sigma.

questing that the Court determine, based on the policy language, that each policy is applicable to the claims against Sigma, and that a $9 million per year aggregate liability applies to the claims against Sigma arising in 1998–99 and 1999–2000, respectively. Plaintiff contends that the Defendant's total aggregate liability is $18 million. Plaintiff brings this motion against AIG solely, and is seeking summary judgment on Count II, Breach of Contract against AIG, and Count VII, Declaratory Judgment/Relief. Defendant AIG contends that the critical limits language contained in both policies is clear, and that its liability limit is $1 million because all claims relating to Sigma are based upon its 1998–99 policy year, and are continuous, repeated, and/or interrelated.

## ANALYSIS

### I. Standard

Pursuant to the Federal Rules of Civil Procedure, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). A summary judgment shall be entered if the moving party manifests that there is no genuine issue as to any material fact, and if the evidence presented is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881

(6th ed.1979)) (citations omitted). This "burden on the moving party may be discharged by ... pointing out to the district court ... that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this evaluation, the court is authorized to examine any documents in a light most favorable to the non-moving party. *See Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir. 1984).

If the burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (1986). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The rule requires the non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd Cty. Bd. of Ed.,* 106 F.3d 135, 145 (6th Cir.1997). The content of the evidence must be admissible, despite the inadmissibility of its form. *Id.*

### II. Fed.R.Civ.P. 19

Federal Rule of Civil Procedure 19(a) provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already

parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Defendant argues that since the individual Sigma representatives who sold the MCA products have not been joined, and they are insured under the policies at issue, Plaintiff has failed to join indispensable parties. Defendant fails to cite any case law in support of this contention. In addition, at the hearing on the instant motion, Defendant did not discuss this argument.

The Court holds that according to the plain language of the Rule, the individual representatives are not required to be joined as plaintiffs in this lawsuit. The absence of the individual representatives will not impede the disposition of this case, nor will it interfere with the parties' ability to protect their interests. Accordingly, the Court does not find this argument to be persuasive.

## III. Count II: Breach of Contract

Plaintiff's principal argument is that the investor lawsuits brought against Sigma are based on separate and distinct wrongful acts—not continuous, repeated, or interrelated acts. Plaintiff further argues that each claim made during the pendency of the 1998–99 policy period comes under a $1 million insurance coverage limit, and that each claim made during the 1999–2000

policy period also comes under a $1 million insurance coverage limit. Finally, Plaintiff contends that AIG's maximum exposure to year 1998–99 claims is $9 million, as is AIG's additional exposure as to year 1999–2000 claims. Thus, Plaintiff asserts that AIG's total exposure under the two policies is $18 million.

Defendant responds by arguing that the lawsuits brought against Sigma resulted from the same wrongful act—the sale of MCA product—and are only covered by the 1998–99 policy, and only up to a maximum exposure of $1 million. In the alternative, Defendant argues that even if the lawsuits are based on separate and distinct wrongful acts, because Sigma provided AIG with notice of all of the claims during the pendency of the 1998–99 policy, the aggregate limit of that policy must apply to the claims.[3]

■■■■ According to Michigan law, which both parties agree governs the issues at stake in this case,

> the rules for construction of an insurance contract are the same as for any other written contract.... Policy language in an insurance contract is to be given its ordinary meaning unless it is apparent from a reading of the whole instrument that a different or special meaning was intended.

*Comerica Bank v. Lexington Ins., Co.*, 3 F.3d 939, 942 (6th Cir.1993). In addition, "[i]f the insurance contract is deemed ambiguous and susceptible to two interpretations, the interpretation that is most favorable to the insured must be adopted." *Id.* This is based upon the maxim of legal interpretation, *contra proferentem*, that

**3.** Defendants do not appear to dispute the Plaintiff's claims that the sales of MCA product involved different sales to different consumers. Def. Brief., p. 15 ("Although Sigma and its registered representatives may have performed a number of distinct acts over the course of several years that caused different harms to different people, all of these acts were tied together (('interrelated')) because they all had one common goal—to promote investment in MCA.").

the contract/evidence is interpreted against the party offering the evidence. An insurance contract is ambiguous if "it is susceptible to two different reasonable interpretations." *Id.*

### 1. Definition of "Interrelated Wrongful Acts"

The 1998–99 policy states that it provides $1 million in coverage for "Each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts." Policy No. 244–27–00, Pl. Exh. A.[4] Additionally, the policy defines "Wrongful Act" as "any negligent act, error or omission." *Id.* at 2.

AIG argues that this language is not ambiguous, and that there was a single/interrelated/continuous wrongful act—Sigma's sale of MCA products. In contrast, Plaintiff argues that each sale of MCA product was a separate and distinct act. The parties do not dispute the fact that Sigma sold a variety of MCA investment products, including debentures, mortgage pools, and real estate pass-through certificates.

■ The Michigan Supreme Court has not interpreted the terms "continuous", "repeated" or "interrelated acts", as is used in insurance policies. Additionally, the Sixth Circuit Court of Appeals has not ruled on the issue as presented by Michigan courts. Accordingly, the Court must "attempt to ascertain how that court would rule if it were faced with the issue." *Meridian Mutual Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir.1999), *rehear'g and suggestion for rehear'g en banc denied*, Feb. 4, 2000. In doing so, "[t]he Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other juris-

dictions on the 'majority' rule...." *Id.* There is no consensus on the correct way in which to interpret this language.

The Court will now discuss and distinguish two decisions from U.S. Courts of Appeals in other circuits.

In *Gregory v. Home Ins. Co.*, 876 F.2d 602 (7th Cir.1989), the policy at issue provided that, *"[t]wo or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim."* *Id.* at 604 (emphasis in original). The U.S. Court of Appeals for the Seventh Circuit noted that

> [t]he underlying class action arose out of a 1980 offering for sale by Producer's Brokerage Company (PBC) (the client of Home Insurance's insured) of episodes in a videotape series... PBC acted as broker of the videotapes. The videotapes were sold individually to investors, most of whom, at the time of sale, also signed a promissory note and a production service agreement authorizing PBC to market the purchased videotape on behalf of the buyer.

*Id.* at 602–603. PBC hired Steven Gilbert to handle the sale of the videotapes. Mr. Gilbert also drafted an opinion letter for PBC advising that the videotapes were not securities and therefore did not require registration with the Securities and Exchange Commission, and that purchase of the videotapes would receive tax deduction benefits. The Internal Revenue Service disagreed with Mr. Gilbert, and "disallowed the income tax deductions claimed by the buyers of the videotapes, and assessed interest and penalties against them." *Id.* at 603. Thereafter, plaintiff purchasers of the videotape filed a class

---

**4.** This language is also contained in the 1999–2000 policy. *See* Policy No. 278–15–39, Pl. Exh. B.

action against PBC, which cross-claimed against Gilbert's law firm. Defendant Home Insurance Company, the law firms' professional liability carrier, assumed defense of the case.

The Seventh Circuit was required to decide if Home's insurance policy was ambiguous, and if the claims at issue were related under the insurance contract. The Indiana law regarding ambiguity in insurance contracts provided:

> [a]mbiguity in an insurance contract exists when [the contract] is susceptible to more than one interpretation and reasonably intelligent [persons] would honestly differ as to its meaning. An ambiguity does not exist simply because a controversy exists between the parties, each favoring an interpretation contrary to the other's. If the court does not find ambiguity in the language of the contract, it will be given its ordinary and plain meaning.

*Id.* at 604 (quoting *Anderson v. State Farm Mut. Auto. Ins. Co.*, 471 N.E.2d 1170, 1172 (Ind.App. 3 Dist.1984)). The Seventh Circuit did not find the policy language as to "related acts," set forth, *supra,* at page 703, to be ambiguous.

As to whether claims against a policy are "related" (*Gregory* policy), or "interrelated" (instant policy), it is noteworthy that all of the sales in *Gregory* involved one specific item—the videotape and an accompanying opinion letter of attorney Steven Gilbert. Given these facts, the Seventh Circuit found the claims brought against the insured to be related. The Seventh Circuit noted: "the individual buyers'

claims all arose from the same conduct of Mr. Gilbert," and held that "the word 'related' covers a very broad range of connections, both causal and logical." *Id.* at 605–606. The Seventh Circuit concluded that "the rule requiring insurance policies to be construed against the party who chose the language" does not require "such a drastic restriction of the natural scope of the definition of the word 'related.' Parties are generally free to include language of their choice in contracts, and courts should refrain from rewriting them." *Id.* at 606.

■ However, in the instant case, Defendant chose to use the term "interrelated" in the policy's coverage cover-sheet. Thereafter, the policy does not include a definition of interrelated in its "Definitions" section. The instant motion deals with the limits of coverage, so the language of the coverage limits is controlling. The Court concludes that the Defendant's choice of the term "interrelated wrongful acts"in the instant policy, contrasted to use of "related acts" in the *Gregory* policy, is more restrictive as to what is excluded from the benefits of aggregate coverage.[5] In WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1988, "related" is defined as "connected" (p.992), while "interrelated" is defined as having a "mutual relationship" (p.638). Given these definitions, the Court concludes that while many situations may be "related"—connected in some manner—significantly fewer situations will be "interrelated"—involving a mutual relationship. Thus, while all Sigma sales of MCA product might have some connection under the broader term

---

5. Defendant's policies use the term "interrelated" on the coverage face sheet, but thereafter use the term "related" in Exclusion "j." Exclusion j deals with the policy year which a claim will be assigned, excluding from coverage any claim arising from the "same or related Wrongful Acts," for which a claim had been previously reported under a prior policy, or for which notice had been given under a previous policy year. Defendant interposed Exclusion j in its argument relating to whether the 1998 policy governs all MCA related claims against Plaintiff. Exclusion "j" is discussed *infra* at p. 707, excluding from coverage any claim arising from the same or related Wrongful Acts, which had been reported or for which notice had been given under a prior policy term.

"related," they do not have mutuality or interrelatedness, because each sale included differing types of MCA product sold by different brokers to different customers. Accordingly, the Court holds that Sigma's sales of MCA product were not "interrelated", the term of coverage utilized in the policy drafted by Defendant.

The U.S. Court of Appeals for the Eleventh Circuit followed the reasoning of *Gregory* in *Continental Casualty Co. v. Wendt*, 205 F.3d 1258 (11th Cir.), *rehear'g denied*, April 19, 2000, a *per curiam* affirmance of a district court opinion, appended to the appeals court decision. The facts, as contained in the district court opinion, were that Bernard Wendt sold promissory notes to investors for a company called K.D. Trinh, and also provided legal services regarding various aspects of the transactions. Wendt and Thomas P. Hall, the lawyer who encouraged him to sell K.D. Trinh promissory notes, were sued in two separate lawsuits. In the second lawsuit, Wendt filed a third party complaint against Hall. Hall's insurance provider brought a declaratory action requesting that the court determine whether or not it was obligated to provide coverage for the third party complaint. The policy language at issue provided:

> Any claim or claims arising out of the same or related wrongful acts, shall be considered first made during the policy term in which the earliest claim arising out of such wrongful acts was made.

*Id.* at 1260 (appendix). In reaching its decision, the court noted that there is disagreement among courts as to the ambiguity of the word "relate." The court found *Gregory* to be persuasive, and concluded:

> The words "relate" or "related" are commonly understood terms in everyday usage. They are defined in the dictionary as meaning a "logical or causal connection between" two events. *See* Webster's Third New International Dictionary (1981). There is no ambiguity unless one is *created* through the device of simply ignoring one half of the definition.

*Id.* at 1262 (appendix) (emphasis in original). The court ultimately concluded that the first lawsuit and the third party complaint were related for the purposes of the insurance policies. The court was not confronted with facts indicating the sale of differing types of K.D. Trinh investment product, nor was it confronted with policy's use of the term "interrelated".

Plaintiff relies upon the unpublished decision of *Stauth v. National Union Fire Ins. Co. of Pittsburgh*, 185 F.3d 875, 1999 WL 420401 (10th Cir. June 24, 1999), to support its claim that the language at issue is ambiguous. In *Stauth*, the policy used the term "interrelated," the term used in the instant policy. The *Stauth* insurance policy defined the term "interrelated wrongful acts." The policy stated that: "All such causally connected errors, statements, acts, omissions, neglects or breaches of duty or other such matters committed or attempted by, allegedly committed or attempted by or claimed against one or more of the Insured Persons shall be deemed interrelated Wrongful Acts." *Id.* at *4. The instant policy has no such definition. The court in *Stauth* noted that there are "two general lines of authority dealing with the term 'interrelated acts' in insurance policies." *Id.* at *7. The *Stauth* court noted that the case before it did not clearly fall into either line of interpretation.

According to the court in *Stauth*, the first line of interpretation

> involves policies which do not further define the term [interrelated acts], leaving it to the courts to ascertain the meaning.... Most courts faced with such policy language have generally taken a pro-insured approach to defining "interrelated," and have held that "legally distinct claims that allege different

wrongs to different people" are not "interrelated" claims.

*Id.* at *7 (quoting *National Union Fire Ins. Co. v. Ambassador Group, Inc.,* 691 F.Supp. 618, 623 (E.D.N.Y.1988)). Additionally, many of the courts that take this approach do so because of the legal maxim that ambiguous terms in an insurance policy should be interpreted in favor of the insured. *Id.* at *8.

The second line of interpretation involves policies which further define the term "interrelated." *Id.* For example, some policies state that "interrelated wrongful acts" means

> Wrongful Acts which are the same related, or continuous; or Wrongful Acts which arise from the same, related, or common nexus of facts. Claims can allege Interrelated wrongful acts regardless of whether such Claims involve the same or different claimants, Insureds, or legal causes of action.

*Id.* (quoting *Specimen Policy Forms For Lawyers Professional Liability Coverage in New York, Practicing Law Institute: Litigation and Administrative Course Handbook Series* 580, at 516 (1998)). According to the court in *Stauth,* "[c]ourts interpreting these specific definitions have been much more willing to find acts to be 'interrelated.' Some of these courts have even concluded that 'but for' causation is enough, under such policy language to render two acts 'interrelated.'" *Id.* at *9.

The *Stauth* court then stated that the policy before it did not fit into either of the two lines of reasoning, because it defined the term "interrelated wrongful acts," using the unspecific term "causally connected." After attempting to define the term "causally connected," the court held that it was a "judgment call" whether to use a narrow or broad definition of the term.

*Id.* at *10. As a result, the court held that it would construe the policy against the drafter, and hold that the actions were not causally connected. *Id.*

Plaintiff also relies on *David v. American Home Assurance Co.,*[6] an unpublished case from the Southern District of New York. In *David,* the court stated that the terms "same," "essentially the same," and "related," are not "unambiguous." *David,* 1997 WL 160367 at *3. However, because New York law allows for the court to look to extrinsic evidence to determine the meaning of ambiguous terms, and because no discovery had taken place, the court did not construe the term against the insurance company. Rather, it decided to deny the motion to dismiss to allow time for discovery.

As to the instant case, applying the facts of the claims—different purchasers of different types of security product at different times—to the undefined term "interrelated" in Defendant's policies, the Court finds that the language of the policies at issue as to "interrelated wrongful acts" is ambiguous. Indeed, while the term "related" may, as set forth in *Wendt,* be commonly understood, Defendant's choice of a different term, "interrelated," undefined in the instant policy, is not such a commonly understood term.

■ To restate the issue before the Court: are the claims at issue in the instant case part of a "series of continuous, repeated or interrelated Wrongful Acts." Policy No. 244–27–09, Pl. Exh. A.

The Court finds that the lawsuits brought against Sigma by its customers, based on the failure of MCA, as to which Sigma initiated notice to Defendant, do not constitute the same wrongful act, nor are they part of a series of continuous, repeated, or interrelated wrongful acts.[7]

---

6. 1997 WL 160367 (S.D.N.Y. April 3, 1997).

7. *See, e.g., Federal Deposit Insurance Corp. v. Mmahat,* 907 F.2d 546 (5th Cir.1990). In

Each sale of MCA product involved different Sigma representatives, different MCA products, and different purchasers. This is not comparable to Sigma selling uniform shares of X Company stock. The Court concludes that the sales of MCA product cannot be considered "continuous, repeated or interrelated Wrongful Acts."

## 2. Applicable Policy Years

■ Defendant argues that since an initial notice regarding potential MCA lawsuits was made during the 1998–99 policy year, only that year's policy applies to these claims. Accordingly, defendant contends that even if the Court finds that these lawsuits are not part of the same wrongful act so as to cap its liability at $1 million, the $9 million aggregate limit of the 1998–99 policy must apply to all of Plaintiff's claims.

Plaintiff contends that since notice of some claims was given to AIG during the 1998–99 policy year, and notice of additional claims was given during the 1999–2000 policy year, both policies apply to create a maximum exposure claim limit of $18 million. The Court finds Plaintiff's argument to be persuasive—that claims arising in 1998–1999 apply against that year's policy, and that claims arising in 1999–2000 apply against that year's policy.

First, as discussed above, the Court has concluded that the MCA lawsuits are not part of the same series of interrelated wrongful acts. As a result, unless one of the exclusions or inclusions included in the policies at issue would prevent coverage, Plaintiff is entitled to receive the coverage of the policy that was in force at the time that each claim was filed.

The Court recognizes that both of Defendant's policies contain an Exclusion "j", which provides:

> This policy does not apply . . .
>
> j) to any claim arising out of the facts alleged, or arising out of the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any occurrence of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time . . . .

Policy No. 244–27–09, Pl. Exh. A, p. 4 and Policy No. 278–15–39, Pl. Exh. B, p. 3. While this provision utilizes the term "related" rather than term "interrelated" as utilized on the policy coverage sheet, the Court finds that the coverage sheet wording using—interrelated—is controlling because it specifies the policy's coverage.

Plaintiff's communications to Defendant began on February 24, 1999, with a letter from Plaintiff's Counsel, Joseph H. Spiegel, Esq., to Defendant AIG informing it of possible claims from Sigma arising out of the sale of MCA products. The letter discussed the MCA bankruptcy proceed-

---

*Mmahat,* an attorney was sued for malpractice for advising a client to make loans in violation of the Federal Home Loan Bank Board regulations. *Id.* at 549. These regulations restricted the amount that a savings and loan (S & L) could loan any one borrower. *Id.* The attorney instructed the client to "never [to] turn a loan down because it is over our loans to one customer limit[ ]." *Id.* The attorney gave this advise so that his law firm generate fees on the closings. *Id.* The law firm was ultimately found liable for $35 million in bad loans. *Id.* The insurance policy at issue had a $1 million limit for single claims

and a $2 million limit for aggregate claims. *Id.* at 553. The insurer argued that the single limit ought to apply because the attorney carried out a "series of related acts." *Id.* The court rejected this argument. The Court noted that "a single motive does not make a single act," rejecting the argument that the acts were logically connected by the attorney's single motive to generate fees for the firm. *Id.* at 554. The court found three discrete acts of malpractice regarding the legal advice which "resulted in discrete losses on seven loans." *Id.* As such, the aggregate limit applied. *Id.*

ings then taking place. The letter specifically stated that "no class action has been filed, no SEC administrative or injunctive proceeding has been initiated, and no individual claims have been filed against SIGMA Financial Corporation...." Letter from Spiegel to AIG, Def. Exh. C. This letter appears to the Court to constitute a coverage notice to the insurer that the insured may, in the future, seek to make claims under the policy.

Indeed, it would have been dangerously foolish for Plaintiff to have failed to send such a communication "early on". As the Sixth Circuit noted in a recent opinion holding that an insured did not provide timely notice of an occurrence under its policies:

An insured cannot rely solely on its subjective beliefs as to whether it expected a claim to arise out of an accident. That would divests [sic] the insurer of the opportunity to make that determination for itself.

*United States Fire Insurance Co. v. Vanderbilt University et al.*, 267 F.3d 465, 474 (6th Cir.2001).

In the instant case, subsequently, Sigma also sent a letter to AIG pursuant to the policy becoming aware that a specific lawsuit had been filed against it, relating to its sale of specific MCA product. *See e.g.*, Def. Exh. G.

The Court concludes that the February 24, 1999 letter did not constitute notice to AIG of all claims arising out of the sale of MCA products, and that Exclusion "j" does not prevent Plaintiff from asserting that claims, arising in a later year, were covered under a separate year insurance policy. The letters from Mr. Spiegel to AIG on March 29, 1999 and May 17, 1999, do not constitute blanket claims as to each wrongful act that occurred relating to Sigma's sale of MCA product. Def. Exh. J and Def. Exh. K. The letters' containing broad warning of potential lawsuits do not turn all of the claims against Sigma into interrelated claims.

■ Defendant also cites to the policy Special Reporting Clause in support of its argument to limit coverage, and argues that this clause prevents Plaintiff from receiving the coverage maximum under each policy. The Special Reporting Clause provides:

If during the Policy Period or during the extended reporting period, if the right is exercised by the Insured in accordance with Special Provision 5, the Insured shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which occurs on or after the Retroactive Date and prior to the end of the Policy Period, and provided the Insured gives written notice to the Company during the Policy Period or the extended reporting period, if applicable, of the nature of the occurrence and specifics of the possible Wrongful Act, *any claim which is subsequently made against the Insured arising out of such Wrongful Act* shall be treated as a claim made during the Policy Period.

Policy No. 244–27–09, Def. Exh. A, p. 6 and Policy No. 278–15–09, Def. Exh. B, p. 6 (emphasis added). In the letter which Sigma sent to AIG, Mr. Spiegel mentioned the failure of MCA, and provided a detailed discussion of the bankruptcy proceedings. Additionally, Mr. Spiegel detailed the possible exposure of Sigma because of the failure of MCA. However, he also stated that while there might possibly be claims filed, "no class action has been filed, no SEC administrative or injunctive proceeding has been initiated, and no individual claims have been filed against SIGMA Financial Corporation...." Letter from Spiegel to AIG, Def. Exh. C.

The Court finds that the letter of February 24, 1999 from Mr. Spiegel to AIG

merely constituted notice of the bankruptcy proceedings against MCA. The bankruptcy proceeding is not a Wrongful Act under the policy. Thus, the Spiegel letter does not constitute notice of all of the claims brought against Sigma, as provided by the Special Reporting Clause. Specifically, the Court notes that in order to satisfy the requirements of the Special Reporting Clause, Plaintiff would need to have provided AIG with "specifics of the possible Wrongful Act." The Court has already found that the wrongful acts at issue in the instant case are the individual sales of MCA products to each consumer, and the letter from Mr. Spiegel does not give notice to AIG of the specifics of each sale of MCA products. The letters from Mr. Spiegel to AIG dated March 29, 1999 and May 17, 1999 also do not provide specific details of each wrongful sale of MCA product, and also do not constitute notice to AIG of a claim against Sigma. Def. Exh. J and Def. Exh. K.

As a result, the Court finds that none of the provisions in the policies themselves operate to prevent Plaintiffs from recovering under both the 1998–99 policy and the 1999–2000 policy.

### 3. Duty to Defend

Plaintiff argues that Defendant has breached its duty to defend. It contends that AIG is aware that the policies at issue are "duty to defend" policies, and that, therefore, it is breaching the contract by refusing to pay. In response, Defendant argues that it has paid the $1 million required under the policies, and that it is not required to protect/compensate Plaintiff further.

As discussed above, the Court finds that the claims made under the 1998–99 policy are not interrelated, and are therefore subject to the $9 million aggregate limit of that policy, and the claims made during the 1999–2000 policy are not interrelated and are subject to the $9 million aggregate limit of that policy. Accordingly, AIG must defend Sigma, according to those limits.

### 4. Conclusion

Plaintiff has proven that Defendant AIG has breached its contract with Plaintiff. Accordingly, the Court holds that Plaintiff is entitled to summary judgment on Count II.

## IV. Count VII: Declaratory Judgment/Relief

Plaintiff seeks a declaratory judgment that AIG has breached the contract, that AIG is estopped from denying its contractual duties, and that Sigma is entitled to judgment upon the contract. For the reasons discussed above, Plaintiff is entitled to summary judgment on this Count.

## CONCLUSION

Based on the above reasoning, the Court GRANTS Plaintiff's Motion for Partial Summary Judgment as to Counts II and VII.

SO ORDERED.