**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1374

KENNETH L. HUNTER; RICK A. DONATHAN; JERRY D. MEDLIN,

       Plaintiffs – Appellants,

v.

TOWN OF MOCKSVILLE, NORTH CAROLINA; ROBERT W. COOK, in his
official capacity as Administrative Chief of Police of the Mocksville Police
Department and in his individual capacity; CHRISTINE W. BRALLEY, in her
official capacity as Town Manager of the Town of Mocksville and in her
individual capacity,

       Defendants – Appellees,

and

INTERLOCAL RISK FINANCING FUND OF NC,

       Intervenor – Appellee.
------------------------------------

NORTH CAROLINA ADVOCATES FOR JUSTICE; NATIONAL
ASSOCIATION OF POLICE ORGANIZATIONS, INC.,

       Amici Supporting Appellants.

Appeal from the United States District Court for the Middle District of North Carolina, at
Greensboro.  Thomas D. Schroeder, Chief District Judge.  (1:12-cv-00333-TDS-JEP)

Argued:  March 22, 2018                      Decided:  July 26, 2018

Before NIEMEYER, WYNN, and DIAZ, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Wynn wrote the majority opinion, in which Judge Diaz joined in full and Judge Niemeyer joined in part. Judge Niemeyer wrote a separate opinion dissenting in part.

---

**ARGUED:** Reynolds Michael Elliot, Robert Mauldin Elliot, ELLIOT MORGAN PARSONAGE, Winston-Salem, North Carolina, for Appellants. Cathryn MacDonald Little, LITTLE & LITTLE, PLLC, Raleigh, North Carolina, for Appellee Interlocal Risk Financing Fund of North Carolina. Patrick Houghton Flanagan, CRANFILL, SUMNER & HARTZOG, LLP, Charlotte, North Carolina, for Appellee Town of Mocksville, North Carolina. **ON BRIEF:** Albert M. Benshoff, BROUGH LAW FIRM, PLLC, Chapel Hill, North Carolina; Philip M. Van Hoy, Stephen J. Dunn, VAN HOY REUTLINGER ADAMS & DUNN, Charlotte, North Carolina, for Appellee Town of Mocksville, North Carolina. Narendra K. Ghosh, Paul E. Smith, PATTERSON HARKAVY LLP, Chapel Hill, North Carolina, for Amicus North Carolina Advocates for Justice. J. Michael McGuinness, THE MCGUINNESS LAW FIRM, Elizabethtown, North Carolina; William J. Johnson, NATIONAL ASSOCIATION OF POLICE ORGANIZATIONS, Alexandria, Virginia, for Amicus National Association of Police Organizations, Inc.

---

WYNN, Circuit Judge:

Plaintiffs—three former police officers with the Town of Mocksville Police Department ("Mocksville PD")—sued Mocksville Administrative Chief of Police Robert W. Cook ("Cook"), Mocksville Town Manager Christine W. Bralley ("Bralley"), and the Town of Mocksville ("the Town," and collectively with Cook and Bralley, "Defendants"), alleging several claims related to Defendants' termination of Plaintiffs' employment. At the conclusion of trial, a jury found Defendants liable to Plaintiffs under both state and federal law, awarded Plaintiffs approximately $1.4 million in compensatory damages, and recommended that the district court further award Plaintiffs approximately $2.6 million in front pay.

In a series of post-trial rulings, the district court awarded Plaintiffs substantially less front pay than the jury had recommended and held that governmental immunity limited the Town's aggregate liability for damages. Plaintiffs appeal both rulings, as well as the district court's pre-trial dismissal of Plaintiffs' First Amendment claims against the Town.

For the reasons that follow, we reverse the district court's conclusion that the Town's insurance policy covered only $1 million of the aggregate damages awarded to Plaintiffs. We also reverse the district court's dismissal of Plaintiffs' First Amendment claims against the Town. But we conclude that the district court properly disposed of Plaintiffs' remaining claims. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

3

I.

Plaintiffs Kenneth L. Hunter, Rick A. Donathan, and Jerry D. Medlin worked at Mocksville PD for several years.[1]  Throughout their tenure with Mocksville PD, Plaintiffs received numerous awards and commendations.  After Cook became Mocksville PD's Administrative Chief of Police, Plaintiffs developed concerns about his personal conduct and management of Mocksville PD.  Plaintiffs initially voiced their concerns to Bralley; however, they noticed no marked improvement in Cook's behavior thereafter.

On December 14, 2011, Plaintiffs used a disposable cell phone to contact the North Carolina Office of the Governor (the "Governor's Office") and report what they viewed as corruption and misconduct within Mocksville PD.  The Governor's Office relayed Plaintiffs' concerns to the State Bureau of Investigation ("SBI") for further inquiry.  A week later, Plaintiffs noticed a local SBI Agent at Mocksville PD and subsequently received a call from that agent on the disposable phone.  Plaintiffs did not return the call and, out of fear of retaliation, disposed of the phone.

Despite Plaintiffs' efforts to remain anonymous, Cook and Bralley eventually identified Plaintiffs as the anonymous callers.  Thereafter, Cook and Bralley consulted with the Town's attorney to determine whether they could lawfully terminate Plaintiffs.

---

[1] We summarize only the factual and procedural history relevant to the issues in the instant appeal, recounting all facts in the light most favorable to Plaintiffs, the prevailing party.  A more in-depth summary of the factual history underlying this lawsuit can be found in *Hunter v. Town of Mocksville*, 789 F.3d 389 (4th Cir. 2015), our earlier opinion in this case.

After being advised that they could do so lawfully, Cook and Bralley terminated Plaintiffs from Mocksville PD on December 29, 2011. Plaintiffs' termination letters stated that they were fired for myriad misdeeds, including "[i]nsubordinat[ion]," "[a]ttitude," and "conduct unbecoming a[n] [o]fficer." *See* J.A. 2381, 2415, 2420. However, prior to Plaintiffs' terminations, none had received any performance-related discipline, and "[t]heir written service records were essentially unblemished." *Hunter v. Town of Mocksville*, 201 F. Supp. 3d 750, 754 (M.D.N.C. 2016). Additionally, this "was the first time that then-Chief Cook had ever terminated an officer," notwithstanding the fact that other officers previously had engaged in misconduct. *Id.* at 753.

In April 2012, Plaintiffs filed a complaint in the U.S. District Court for the Middle District of North Carolina against the Town, Cook, and Bralley. In their complaint, Plaintiffs alleged that they were (1) terminated in retaliation for exercising their free speech rights under the First Amendment of the United States Constitution, in violation of 42 U.S.C. § 1983; (2) denied their rights to free speech, guaranteed by Sections 1 and 14 of Article 1 of the North Carolina Constitution; and (3) wrongfully discharged against public policy, in violation of North Carolina state law.

In September 2013, the district court granted partial summary judgment to Defendants on all of Plaintiffs' First Amendment claims. In a memorandum opinion explaining its decision, the district court first concluded that qualified immunity shielded Cook and Bralley from suit. The district court further concluded that Plaintiffs' terminations could not fairly be attributed to the Town for purposes of municipal liability under Section 1983 because Plaintiffs failed to demonstrate that either Cook or Bralley

5

possessed "final policymaking authority" to set employment policy for the Town. *Hunter v. Town of Mocksville*, No. 1:12-cv-333, 2013 WL 5726316, at *9–10 (M.D.N.C. Oct. 21, 2013), *vacated in part*, 2014 WL 881136 (M.D.N.C. Jan. 22, 2014). And the district court reserved judgment on the question of whether Plaintiffs could properly pursue their free speech claims under the North Carolina Constitution. *Id.* at *11.

In January 2014, the district court reversed its grant of summary judgment to Cook and Bralley on Plaintiffs' First Amendment claims, instead concluding that neither defendant was entitled to qualified immunity. *Hunter v. Town of Mocksville*, No. 1:12-cv-333, 2014 WL 881136, at *2 (M.D.N.C. Jan. 22, 2014). In so doing, the district court relied on *Durham v. Jones*, 737 F.3d 291 (4th Cir. 2013), then a newly issued opinion, in which this Court held that "it was clearly established in the law of this Circuit . . . that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, is protected," *id.* at 303–04 (citation omitted). This Court affirmed the district court's holding that neither Cook nor Bralley was entitled to qualified immunity, but concluded that we lacked subject matter jurisdiction to consider the propriety of the district court's interlocutory order dismissing Plaintiffs' First Amendment claims against the Town. *Hunter v. Town of Mocksville*, 789 F.3d 389, 400–03 (4th Cir. 2015).

Following a nine-day trial, a jury returned a verdict for Plaintiffs on their First Amendment claims against Cook and Bralley, as well as a verdict for Plaintiffs on their state-law wrongful-discharge claims against the Town. The jury found all Defendants liable to Plaintiffs for approximately $1.4 million in compensatory damages, and awarded

6

Plaintiffs an aggregate total of $60,000 in punitive damages to be paid specifically by Cook and Bralley. The jury also returned an advisory verdict recommending that Defendants pay Plaintiffs approximately $2.6 million in front pay. Soon thereafter, Plaintiffs moved for the entry of judgment and equitable relief in the form of reinstatement or, alternatively, the jury-recommended front-pay awards.

On August 12, 2016, the district court entered judgment on the verdicts, granting Plaintiffs the compensatory and punitive damages awarded by the jury. *Hunter*, 201 F. Supp. 3d at 767. The district court also partially granted Plaintiffs' requests for equitable relief. In particular, the district court denied Plaintiffs' requests for reinstatement but granted Plaintiffs front pay in lieu of reinstatement. However, the district court's front-pay award amounted to an aggregate total of approximately $600,000—roughly one-fourth of the amount recommended by the jury.[2] Consequently, two plaintiffs—Donathan and Medlin—moved for the district court to reconsider its grant of equitable relief in the form of front pay and instead award them reinstatement.

On February 21, 2017, the district court issued several dispositive rulings. First, the district court addressed Donathan and Medlin's motion to reconsider its decision to award front pay in lieu of reinstatement. Upon reconsideration, the district court upheld

---

[2] Specifically, the district court awarded front pay in the amount of $193,676 to Hunter, $89,063 to Donathan, and $85,360 to Medlin. *Hunter*, 201 F. Supp. 3d at 767. However, Plaintiffs' awards increased to $211,893, $197,523, and $176,299, respectively, after the district court added the present value of Plaintiffs' lost retirement benefits and separation allowances. *See Hunter v. Town of Mocksville*, 237 F. Supp. 3d 349, 353 (M.D.N.C. 2017).

7

its initial decision to deny reinstatement to Medlin, but granted Donathan's request for reinstatement to a lieutenant position at Mocksville PD upon the next available opening. *Hunter v. Town of Mocksville*, 237 F. Supp. 3d 349, 354–56 (M.D.N.C. 2017).

Second, the district court concluded that the Town enjoyed state-law governmental immunity from tort claims, like the claims asserted by Plaintiffs, arising from the actions of the Town's officers and employees while performing a governmental function. *Id.* at 356–57 (citing *Clayton v. Branson*, 570 S.E.2d 253, 256–57 (N.C. Ct. App. 2002)). The district court further observed that "[u]nder North Carolina law, the Town waives its immunity to the extent it has purchased insurance." *Id.* at 357 (citing, *inter alia*, N.C. Gen. Stat. § 160A-485)). Consequently, because all parties agreed that the Town maintained *some* amount of liability insurance, the district court sought to determine the extent of the Town's insurance coverage. To that end, the district court allowed the Town's insurer—Interlocal Risk Financing Fund of North Carolina ("Interlocal")—to intervene in the proceedings. *Id.* at 358. Interlocal argued that the Town policy's per-claim limit of $1 million limited Plaintiffs' aggregate recovery against the Town to $1 million. By contrast, Plaintiffs argued that the policy provided up to $1 million *per plaintiff* and, therefore, $3 million in the aggregate. *Id.* at 358–359.

The district court agreed with Interlocal. Specifically, the district court analyzed the Town's insurance policy and concluded that, per the policy's terms, all three Plaintiffs' claims together constituted one single claim under the policy—not three separate claims. Therefore, given the policy's per-claim limit of $1 million, the district

8

court concluded that the Town had waived its governmental immunity in the amount of $1 million only. *Id.* at 361–66.

Because the Town's governmental immunity precluded Plaintiffs from recovering approximately half of their damages from the Town, Plaintiffs argued that they lacked an "adequate state remedy" against the Town and thus could seek to recover against the Town under the North Carolina Constitution. *Id.* at 366–67. The district court disagreed, concluding that Plaintiffs' ability to recover $1 million in insurance proceeds from the Town constituted an adequate state remedy. *Id.* at 367–68. Accordingly, the district court dismissed Plaintiffs' state constitutional claims. *Id.*

On March 3, 2017, the district court entered final judgment against Defendants. Specifically, the district court held Defendants jointly and severally liable to Plaintiffs for a total of $1,990,544 in compensatory damages and front pay. The Court also ordered Cook and Bralley each to pay each Plaintiff $10,000 in punitive damages. And, notwithstanding its conclusion that Defendants were jointly and severally liable for the nearly $2 million in compensatory damages and front pay, the district court held that "pursuant to N.C. Gen. Stat. §160-485(c), *the maximum liability of the Town of Mocksville for damages under this Judgment shall not exceed One Million dollars ($1,000,000).*" J.A. 2854 (emphasis added). Thus, although the Town was jointly and severally liable for the approximately $2 million in damages owed to Plaintiffs, the Town's governmental immunity shielded it from having to pay more than $1 million.

Plaintiffs noted a timely appeal.

9

II.

We begin with the district court's interpretation of the coverage limit in the Town's employment-practices liability insurance policy—a question of law we review de novo. *See Cont'l Cas. Co. v. Amerisure Ins. Co.*, 886 F.3d 366, 370 (4th Cir. 2018). As mentioned above, North Carolina municipalities enjoy governmental immunity from common-law tort claims arising out of their performance of governmental functions. *Evans v. Hous. Auth. of Raleigh*, 602 S.E.2d 668, 670 (N.C. 2004).[3] However, a municipality, like the Town, waives such immunity if and to the extent it has purchased liability insurance covering tortious acts. *See* N.C. Gen. Stat. § 160A-485;[4] *Clayton*, 570 S.E.2d at 257.

---

[3] Governmental immunity has no bearing on Plaintiffs' First Amendment claims against the Town under Section 1983. *See Owen v. City of Independence*, 445 U.S. 622, 647–48 (1980) (explaining that Section 1983 abrogated any sovereign immunity possessed by municipalities for violations of the Federal Constitution and federal law); *Corum v. Univ. of N.C.*, 413 S.E.2d 276, 283 (N.C. 1992) ("[U]nder the federal cases interpreting section 1983, sovereign immunity alleged under state law is not a permissible defense to section 1983 actions."). Consequently, because we ultimately conclude that the district court erred in dismissing Plaintiffs' First Amendment claims against the Town, *see infra* Part III, here the import of our contractual analysis boils down to determining the extent to which the Town is liable to pay Plaintiffs' damages and front pay awards.

[4] Specifically, the statute provides: "Any city is authorized to waive its immunity from civil liability in tort by the act of purchasing liability insurance. Participation in a local government risk pool . . . shall be deemed to be the purchase of insurance for purposes of this section. Immunity shall be waived only to the extent that the city is (Continued)

10

Here, it is undisputed that the Town has purchased such insurance. The critical inquiry, therefore, is the extent to which the Town has waived its governmental immunity by virtue of its purchase of insurance. Plaintiffs argue that the district court erred when it construed the Town's insurance policy to cover only $1 million, in aggregate, of Plaintiffs' damages and front-pay awards. In their view, the Town's policy covers up to $1 million for *each* Plaintiff's claim—for a combined limit of $3 million. The parties agree that North Carolina law governs the interpretation of the Town's insurance policy. Accordingly, we start by reciting the North Carolina law applicable to the interpretation of insurance contracts.

A.

Under North Carolina law, "the object of construing an insurance policy 'is to arrive at the insurance coverage intended by the parties when the policy was issued.'" *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC*, 692 S.E.2d 605, 612 (N.C. 2010) (quoting *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co*, 172 S.E.2d 518, 522 (N.C. 1970)). With this principle in mind, when the language contained in a policy is unambiguous, courts must "enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." *Wachovia*, 172 S.E.2d at 522. "If the parties have defined a term in the

---

indemnified by the insurance contract from tort liability." N.C. Gen. Stat. § 160A-485(a).

agreement, then we must ascribe to the term the meaning the parties intended." *Harleysville*, 692 S.E.2d at 612. Any undefined, "nontechnical" words in the policy are given a "meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise." *Wachovia*, 172 S.E.2d at 522.

When the language of the policy is ambiguous, courts must resolve the ambiguity in favor of coverage. *Id.* "We do so because the insurance company is the party that selected the words used." *Harleysville*, 692 S.E.2d at 612. "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Register v. White*, 599 S.E.2d 549, 553 (N.C. 2004). And "[a]n ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case create more than one reasonable interpretation of the contractual provisions." *Id.* Consequently, "[i]n interpreting the language of an insurance policy, courts must examine the policy from the point of view of a reasonable insured." *Id.* If a word in the policy "has more than one meaning in its ordinary usage and if the context does not indicate clearly the one intended, it is to be given the meaning most favorable to the policyholder, or beneficiary." *Wachovia*, 172 S.E.2d at 522. Additionally, any provisions excluding or limiting coverage are construed strictly against the insurance company. *Harleysville*, 692 S.E.2d at 612.

B.

The Town policy's Declarations Page provides the following limits of insurance:

| | |
|---|---|
| Each Claim Limit | $1,000,000 |
| Annual Aggregate Limit for all Claims | $3,000,000 |
| Deductible (Each Claim) | $5,000 |

12

*Id.* at 2683.  Section I of the policy, titled "Employment Practices Liability Coverage," provides: "We will pay those sums that the insured becomes legally obligated to pay as damages resulting from 'claims' to which this insurance applies, against the insured by reasons of 'employment wrongful act(s).'" *Id.* at 2704.  Section VI defines a "claim":

> "Claim" means a demand received by the insured for money damages, . . . filing and or service of suit papers or arbitration proceedings filed against the insured arising out of "employment wrongful act(s)" to which this insurance applies.

*Id.* at 2713.  And Section VI defines "employment wrongful act(s)" as, among other things, "actions involving . . . termination of employment, . . . retaliatory action, . . . or other employment-related practices, policies, acts or omissions."  *Id.*  The policy further provides that "[t]he amount we will pay for damages is limited as described in Section III - Limits of Insurance."  *Id.* at 2704.

Section III provides the following:

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;
   b. "Claims" made or "suits" brought; or
   c. Persons or organizations making "claims" or bringing "suits".

2. The Annual Aggregate Limit is the most we will pay for all damages

3. Subject to 2. above, the Each Claim Limit is the most we will pay for all loss arising out of any "employment wrongful act(s)" covered by this policy.  "Claims" based on and arising out of the same act or interrelated acts of one or more insureds shall be considered to be a single "claim".

13

*Id.* at 2708.  Finally, the policy provides that "[t]he deductible amount stated in the Declarations, if any, applies to all damages sustained by any person or organization as the result of any one 'claim.'"  *Id.* at 2710.

C.

The district court analyzed these contractual terms and concluded that the Town's policy limited Plaintiffs' aggregate recovery to $1 million.  In so doing, the district court first observed that the plain language of the policy provides that all claims "based on and arising out of the same or interrelated employment wrongful acts" of the Town are subject to the $1 million Each Claim Limit, "regardless of the number of persons bringing claims."  *Hunter*, 237 F. Supp. 3d at 361–62.  The district court then concluded that all of Plaintiffs' claims were "'based on and aros[e] out of the same act' by the Town; namely, the Town's approval of Plaintiffs' joint terminations upon the urging of Bralley and Cook, who viewed their call to the Governor as insubordinate."  *Id.* at 363 (alteration in original).

In the alternative, the district court concluded that, at the very least, all three Plaintiffs' claims were based on and arose out of "interrelated" employment wrongful acts, which also rendered them a single claim under the policy and thus subject to the policy's $1 million Each Claim Limit.  *Id.*  In reaching this conclusion, the district court acknowledged that the policy did not define the phrase "*interrelated* [employment] wrongful act(s)," yet expressly defined the phrase "*related* employment wrongful act(s)" as "two or more wrongful acts that have as a common nexus any fact, circumstance,

14

situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions, or causes." *Id.* (emphasis added).

Notwithstanding the policy's failure to define "interrelated"—while expressly defining "related"—the district court concluded that the meaning of "interrelated" was unambiguous when considered in the context of the policy as a whole. The district court defined the word "interrelated" to mean "having a mutual or reciprocal relation," the word "mutual" to mean "shared in common," and the word "reciprocal" to mean "shared or mutually existing." *Id.* (internal quotation marks omitted) (quoting *Webster's Third New International Dictionary*, 1182 (1986)). Next, the district court appended these dictionary definitions of "interrelated" to the policy's express definition of "related wrongful employment act(s)," holding the following:

> For Plaintiffs' claims to be considered a single claim because they are interrelated, the employment wrongful acts must have some common nexus of fact, circumstance, situation, event, transaction, or cause *that is shared or mutually existing*.

*Id.* at 364 (emphasis added). Applying this definition of "interrelated" to the facts, the district court determined that Plaintiffs' claims were caused by terminations that had, "at a minimum, a common cause"—namely, Plaintiffs' exercise of their First Amendment rights by calling the Governor's Office to complain about misconduct within Mocksville PD. *Id.* Accordingly, the district court held Plaintiffs' claims were based on and arose out of interrelated employment wrongful acts of the Town and therefore constituted a single claim, subject to the $1 million Each Claim Limit. *Id.*

D.

15

On appeal, Plaintiffs contend that the district court erred when it concluded that (1) each Plaintiff's claim arose out of the "same" wrongful act and (2), in the alternative, the meaning of "interrelated" was unambiguous, and that under that unambiguous meaning, Plaintiffs' claims arose out of "interrelated" acts. We agree with Plaintiffs.

First, Plaintiffs' claims are neither based on nor arise out of the "same" "employment wrongful act." The word "same," while undefined in the policy, is nontechnical and unambiguous. Therefore, we will give it the meaning it has acquired in its ordinary usage. *Harleysville*, 692 S.E.2d at 612. In its ordinary usage, same means "[i]dentical or equal; resembling in every relevant respect." *Same*, Black's Law Dictionary (10th ed. 2014). And, as mentioned above, "employment wrongful act" includes an "action[] involving . . . termination of employment." *See supra* Part II.B. Applying these two definitions, we conclude that there were three wrongful acts that served as the bases of Plaintiffs' lawsuit: the Town's termination of Hunter; its termination of Medlin; and its termination of Donathan. The Town terminated each Plaintiff by separate letter and, at least ostensibly, for different written reasons. *See* J.A. 2381, 2415, 2420. The jury's finding that the true *reasons* underlying Plaintiffs' terminations were identical does not undermine our conclusion that the Town *acted* thrice—not once. Indeed, even the jury instructions listed each Plaintiff's termination separately. *See id.* at 2502–07.

Rather than focusing on the Town's three wrongful terminations, the district court characterized the Town's wrongful action as the "approval" of Plaintiffs' terminations only. But the jury found that the Town *itself* terminated each Plaintiff. *See id.* And the

16

policy language requires an inquiry into the insured's *actions*, not the insured's *approval* of the actions of others. Here, the Town fired three different individuals. Accordingly, we conclude that Plaintiffs' claims against the Town are based on and arise out of separate and distinct employment wrongful acts of the Town.

We consider next whether Plaintiffs' claims are based on and arise out of "interrelated" wrongful acts of the Town. We conclude that the meaning of the term interrelated is ambiguous for several reasons.

To begin, the policy does not define the term "interrelated." A number of courts have held that the meaning of "interrelated" in an insurance coverage provision was ambiguous when, as here, the contract did not expressly define the term. *See, e.g.*, *McCuen v. Am. Cas. Co. of Reading*, 946 F.2d 1401, 1408 (8th Cir. 1991) (concluding that the term interrelated is "so elastic, so lacking in concrete content, that [it] import[s] into the contract . . . substantial ambiguities"); *Sigma Fin. Corp. v. Am. Int'l Specialty Lines Ins. Co.*, 200 F. Supp. 2d 697, 704–07 (E.D. Mich. 2001); *Am. Home Assurance Co. v. Allen*, 814 N.E.2d 662, 669 (Ind. Ct. App. 2004).[5] Perhaps because of these

---

[5] To be sure, some courts have held that the meaning of "interrelated" was not ambiguous, under the particular facts of the case, when left undefined in an insurance contract. *See, e.g.*, *F.D.I.C. v. Gen'l Star Nat'l Ins. Co.*, No. CV 11-3729-JFW (MRWx), 2012 WL 398352, at *6 & n.5 (C.D. Cal. Feb. 7, 2012) (holding that multiple errors and omissions by a single mortgage appraiser with regard to the appraisal of a single property were "Interrelated Acts" for purposes of errors and omissions policy, notwithstanding that policy did not define "interrelated"). But, as at least one court has observed, in the absence of an express contractual definition, "interrelated" "is construed narrowly[,] and more significant overlap" than that found between similar "claims brought by different individuals" is "necessary before claims will be deemed interrelated," *Brecek & Young*
(Continued)

decisions finding ambiguity in the meaning of "interrelated," it has now become "commonplace" for insurance policies to expressly define the term. Dale Joseph Gilsinger, Annotation, *Construction and Application of "Interrelated Wrongful Acts" in Liability Insurance Policies*, 13 Am. L. Rep. 7th Art. 7, § 2 (2016). Yet notwithstanding this trend toward expressly defining "interrelated," Interlocal elected not to define the term in the policy.

Interlocal's failure to define "interrelated" in the policy further renders the term ambiguous because courts and insurance policies do not define the term "interrelated" in a uniform manner, meaning that there is no "ordinary" definition of the term. For example, the most common contractual definition of "interrelated wrongful acts"—acts "which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events, or transactions"—seems to sweep broadly, potentially encompassing claims by multiple claimants.[6] 13 Am. L. Rep. 7th

---

*Advisors, Inc. v. Syndicate 2003, Lloyd's of London*, No. 4:11CV3003, 2012 WL 5569242, at *12 (D. Neb. Nov. 15, 2012).

[6] That definition, however, is far from universal, with other insurance contracts defining "interrelated wrongful acts" using different language. *See, e.g.*, *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 175 (4th Cir. 2015) (defining "interrelated wrongful acts" as "any Wrongful Acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction or event"); *Templeton v. Catlin Specialty Ins. Co.*, 612 Fed. App'x 940, 946 (10th Cir. 2015) (defining "interrelated wrongful act" as "[a]ny Wrongful Acts that are: 1. similar, repeated or continuous; or 2. connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies"); *Zahler v. Twin City Fire Ins. Co.*, No. 04 Civ. 10299(LAP), 2006 WL 846352, at *5 (S.D.N.Y. (Continued)

Art. 7, § 2. However, Interlocal exclusively reserved that definition for "related" employment wrongful act(s), J.A. 2704, while leaving "interrelated" undefined. Some courts have observed that "interrelated," when left undefined in a contract, is generally regarded as more restrictive than "related." *See, e.g.*, *Sigma*, 200 F. Supp. 2d at 704 ("The Court concludes that the Defendant's choice of the term 'interrelated wrongful acts' in the instant policy, contrasted to [the] use of 'related acts' in the [other] policy, is more restrictive as to what is excluded from the benefits of aggregate coverage."); *Brecek & Young Advisors*, 2012 WL 5569242, at \*12; *Am. Home Assurance Co.*, 814 N.E.2d at 669. Therefore, even if the policy-specific definition of "related" encompasses claims by multiple claimants premised on distinct wrongs, the definition of "interrelated" may not.

Further, the Tenth Circuit has recognized that when, as here, an insurance contract leaves the term "interrelated" undefined, "[m]ost courts . . . have generally taken a pro-insured approach to defining 'interrelated,' and have held that 'legally distinct claims that allege *different wrongs to different people*' are not 'interrelated' claims." *Stauth v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 185 F.3d 875, 1999 WL 420401, at \*7 (10th Cir. 1999) (unpublished after argument) (emphasis added) (quoting *Nat. Union Fire Ins. Co. of Pittsburgh v. Ambassador Grp.*, *Inc.* 691 F. Supp. 618, 623 (E.D.N.Y. 1988)). To that

_____

Mar. 31, 2006) (defining "interrelated wrongful acts" as "any Wrongful Act . . . based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events"). Again, these differing definitions of "interrelated" may or may not encompass claims by multiple claimants.

19

end, other courts have held that when an insurance contract fails to define "interrelated," claims brought by different individuals are not "interrelated." *See, e.g.*, *Am. Int'l Specialty Lines Ins. Co. v. Nat'l Ass'n of Bus. Owners & Prof'ls*, 324 F. Supp. 2d 353, 359–60 (E.D.N.Y. 2004) ("[A]lthough the Policy fails to define 'continuous, repeated or interrelated,' in the Court's view, claims asserted by the *same person* which are legally similar in nature constitute 'continuous, repeated or interrelated Wrongful Acts' within the meaning of the Policy." (emphasis added)); *Home Ins. Co. of Ill. (New Hampshire) v. Spectrum Info. Techs., Inc.*, 930 F. Supp. 825, 847–48 (E.D.N.Y. 1996); *Am. Home Assurance Co.*, 814 N.E.2d at 669 (declining to find claims "interrelated" when the wrongful acts "do not share any mutuality or interdependence among themselves," or put differently, "each alleged wrongful act does not impact another act that in turn impacts it"). Accordingly, under that definition of the term, Plaintiffs' separate terminations would not give rise to "interrelated" claims.

Because Interlocal has chosen to provide the term "related" with the definition commonly reserved for "interrelated" while leaving "interrelated" undefined, we conclude that the meaning of "interrelated" is uncertain and therefore ambiguous as to whether it encompasses claims by multiple claimants based on multiple wrongs. *See Register*, 599 S.E.2d at 553. Further, we conclude that the term "interrelated," as used in this particular policy, is more restrictive than the definition provided for the term "related."

Notably, the district court's construction of "interrelated employment wrongful act(s)" rendered that phrase's definition virtually identical to the policy's definition of

20

"related employment wrongful act(s)." In particular, the district court defined "interrelated wrongful employment act(s)" as acts that have "some common nexus of fact, circumstance, situation, event, transaction, or cause *that is shared or mutually existing*." *See Hunter*, 237 F. Supp. 3d at 364 (emphasis added). But the appended phrase "shared or mutually existing," which the district court derived from dictionary definitions of "interrelated," adds nothing to the "common nexus" requirement already found within the policy's definition of "related," leaving no daylight between "related" acts and "interrelated" acts. And if at all possible, we must reject any construction of the contract that defines *different* terms in the *same* manner, unless the contract expressly indicates otherwise. *See Metric/Kvaerner Fayetteville v. Fed. Ins. Co*, 403 F.3d 188, 198 (4th Cir. 2005) ("[A]n insurance policy should be construed to give different meanings to different terms utilized therein."); *Lane v. United States*, 286 F.3d 723, 731 (4th Cir. 2002) (explaining that in construing a written instrument, courts should "avoid a reading which renders some words altogether redundant" (citation omitted)); *Rouse v. Williams Realty Bldg. Co.*, 544 S.E.2d 609, 613 (N.C. Ct. App. 2001). Accordingly, the district court's effort to synthesize dictionary definitions of "interrelated" with the contract's definition of "related" did not resolve the contract's ambiguity as to the meaning of "interrelated."

In light of the policy's ambiguity, we are unable to discern the scope of the term "interrelated" as used by the parties in this contract. Therefore, we must resolve the ambiguity in favor of Plaintiffs—the beneficiaries. *Wachovia*, 172 S.E.2d at 522. Moreover, given that Section III.3 is a provision that serves to exclude coverage, we

21

strictly construe Section III.3's ambiguous coverage exclusion against Interlocal. *Harleysville*, 692 S.E.2d at 612; *see also State Capital Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 72 (N.C. 1986) ("[T]he sole object of the insured in obtaining insurance is indemnity. To exclude coverage, exclusion clauses must be drafted in clear and unambiguous terms. The terms being ambiguous, they must be strictly construed against the insurer." (alteration in original) (quoting *Travelers Ins. Co. v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 367 (Tenn. 1973))). Accordingly, we conclude that Plaintiffs' claims are neither based on nor arise out of interrelated wrongful acts of the Town.

\* \* \* \* \*

For the reasons stated above, we conclude that the Town has waived its governmental immunity for up to $1 million *per Plaintiff* for damages resulting from the three wrongful terminations of Plaintiffs, subject to the $3 million Annual Aggregate Limit of the Town's insurance policy.[7]

## III.

Next, we address whether the district court erred in granting summary judgment in favor of the Town on Plaintiffs' First Amendment claims under Section 1983 on the

---

[7] Because we agree with Plaintiffs' interpretation of the policy, we need not address Plaintiffs' contention that the district court erred in dismissing their separate state constitutional claims on the grounds that Plaintiffs had an adequate remedy under state law. On that point, Plaintiffs only argue that their remedy would be inadequate if we were to sustain the district court's interpretation of the policy, limiting Plaintiffs' aggregate recovery to $1 million. *See* Appellants' Br. at 44.

grounds that "there is no evidence the Town had a policy of retaliation." *Hunter*, 2013 WL 5726316, at \*1. In the district court's view, the evidence produced by Plaintiffs suggested only "that Town Manager Bralley and/or Chief Cook were the final decision-makers for personnel matters," not final policymakers for the Town. *Id.* at \*10. On appeal, Plaintiffs argue that the district court erred in reaching this conclusion because, as a matter of municipal law and custom, Bralley and Cook constituted final policymakers for the Town with regard to the conduct at issue.

This Court reviews de novo whether Cook or Bralley's unconstitutional actions may fairly be characterized as actions of the Town such that the Town may be held liable to Plaintiffs for damages under Section 1983. *See Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). We conclude that Bralley's actions may fairly be imputed to the Town, as she acted with final policymaking authority when she fired Plaintiffs in violation of their First Amendment rights. We conclude further that Cook did not act with such authority. Because Bralley's actions, by themselves, are sufficient to subject the Town to liability under Section 1983, we reverse the district court's grant of summary judgment in favor of the Town on Plaintiffs' First Amendment claims.

A.

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. For

23

purposes of Section 1983, a municipality is considered a "person" and thus is subject to suit. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). That said, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Although municipal liability under Section 1983 attaches only to "action [taken] pursuant to official municipal policy of some nature," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986) (internal quotation marks omitted), "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," *id.* at 480. "To be sure, 'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Id.* at 480–81. Nonetheless, the Supreme Court has explained that the concept of "official policy" for purposes of Section 1983 extends beyond formal ordinances and policies:

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. *If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be*

24

*taken only once or to be taken repeatedly.* To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Id.* at 481 (emphasis added) (footnote omitted); *see also Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) ("While municipal 'policy' is found most obviously in municipal ordinances, regulations and the like which directly command or authorize constitutional violations, . . . it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy.").

Relying on this precedent, this Court has held that "[a] government policy or custom need not have received formal approval through the municipality's official decisionmaking channels to subject the municipality to liability." *Riddick v. Sch. Bd.*, 238 F.3d 518, 522 (4th Cir. 2000). Nor must an "official policy" be broadly applicable to factual circumstances likely to be repeated. To the contrary, we have recognized that a "governmental unit may create an official policy by making *a single decision* regarding a course of action in response to particular circumstances" so long as that governmental unit possessed "final authority to create official policy." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (emphasis added); *see also Pachaly v. City of Lynchburg*, 897 F.2d 723, 726 (4th Cir. 1990) ("[A] single act by a municipality may give rise to civil liability if it is shown that the officials of the municipality responsible for establishing the challenged policy made a calculated choice to follow the course of action deemed unconstitutional."). Accordingly, in assessing whether a municipality may be held liable for the constitutional or statutory violations of their decisionmakers, the

25

touchstone inquiry is whether "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016) (internal quotation marks omitted). If so, the decisionmaker's actions may fairly be attributed as reflecting municipal policy. *Pembaur*, 475 U.S. at 481.

"The question of who possesses final policymaking authority is one of state law." *Riddick*, 238 F.3d at 523 (citing *Pembaur*, 475 U.S. at 483). In answering this question, "we must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Id.* (internal quotation marks omitted) (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). And although it is true that a municipality may delegate its final policymaking authority to other officials or governing bodies, *Spell*, 824 F.2d at 1387, we must never "assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (plurality opinion).

Several principles guide our analysis of whether a municipal official possesses final policymaking authority with respect to a challenged action. For one thing, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.* at 127; *see also Crowley v. Prince George's Cty.*, 890 F.2d 683, 687 (4th Cir. 1989) ("It is the municipality's policies, not the subordinate's departure from them, that must underlie liability." (internal quotation marks omitted)). "Similarly, when a subordinate's decision is subject to review by the municipality's authorized

26

policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies." *Praprotnik*, 485 U.S. at 127. In other words, there is a marked difference between "the authority to make final *policy* [and] the authority to make final implementing *decisions*." *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995). The following hypothetical posited by Justice Brennan in *Pembaur*, which this Court has adopted as controlling law, illustrates this difference:

> [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. . . . Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. *However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.*

*Pembaur*, 475 U.S. at 483 n.12 (opinion of Brennan J., joined by White, Marshall, & Blackmun, JJ.) (emphasis added); *see also Crowley*, 890 F.2d at 686–87 (quoting same); *Greensboro Prof'l Fire Fighters Ass'n*, 64 F.3d at 966 (quoting same).

B.

In concluding that neither Cook nor Bralley was a final policymaker of the Town with regard to the termination of Plaintiffs, the district court looked only to state law— specifically, North Carolina General Statute Section 160A-164, which vests the Mocksville Town Board with discretion to "adopt or provide" personnel policies for

27

Town employees.[8] *See Hunter*, 2013 WL 5726316, at *10. This was error. Read alone, the state statute does vest authority in the Town Board to make personnel decisions. However, as the Town concedes, *see* Appellees' Br. at 32, when determining whether a local official possesses final policymaking authority, the Supreme Court has directed courts to look to "the relevant legal materials, including state *and local positive law*," *Jett*, 491 U.S. at 737 (emphasis added). And the relevant local positive law in this case makes clear that the Town delegated to Bralley final and unconstrained policymaking authority with regard to the challenged actions at issue.

North Carolina General Statute Section 160A-148 provides that town managers, like Bralley, "shall be responsible to the council for administering all municipal affairs placed in [their] charge" and, among other things, "shall appoint and suspend or remove all city officers and employees not elected by the people . . . in accordance with such general personnel rules, regulations, policies, or ordinances as the council *may* adopt." N.C. Gen. Stat. § 160A-148 (1973) (emphasis added). Like the wording found in Section 160A-164, the use of the word "may" in Section 160A-148 indicates that the North

---

[8] In particular, the statute provides that "[t]he council *may* adopt or provide for rules and regulations or ordinances concerning but not limited to annual leave, sick leave, special leave with full pay or with partial pay supplementing workers' compensation payments for employees injured in accidents arising out of and in the course of employment, hours of employment, holidays, working conditions, service award and incentive award programs, other personnel policies, and any other measures that promote the hiring and retention of capable, diligent, and honest career employees." N.C. Gen. Stat. § 160A-164 (1979) (emphasis added).

28

Carolina General Assembly contemplated that town councils, like the Town Board, may decline to adopt any personnel rules, regulations, policies, or ordinances altogether.

Here, the Town Board has exercised its statutory authority not to adopt its own policies or regulations governing the specific terms of its employees' employment. In particular, the Town Board "does not have a written personnel policy." J.A. 112. Nor does the Town Board have any formal grievance procedure or any "other requirement which requires the Town to provide an employee in a potential discharge situation with pre-discharge procedural due process . . . or post-discharge procedural due process." *Id.* And it is undisputed that "since about 1987 or 1988, the Town Board has had no ordinance or grievance procedure by which employees who are disciplined or discharged from employment could challenge adverse employment actions imposed on them." *Id.* Around that time, the Town Board decided to "discontinue" all personnel policies then in effect. *Id.* at 665–66.

Rather than establishing a grievance procedure or fashioning its own employment policies, the Town Board adopted the following personnel ordinance:

> Town personnel shall be employed by the Town Manager, within the appropriations for that purpose; *the terms of the positions shall be at the will of the Town Manager.* Fringe benefits shall be as specified from time to time by the Town Manager, *subject to the approval of the Board.*

Mocksville, N.C., Code of Ordinances § 2-4.1 (emphases added). Thus, under the ordinance's plain language, the Town Board delegated to Bralley, as Town Manager, its statutory authority to set personnel policy for the Town. In particular, the ordinance confers on Bralley unconstrained authority to define nearly all terms of employment for

29

Town personnel, including all matters related to Plaintiffs' hiring, supervision, and discharge. *Cf. Brady v. Fort Bend Cty.*, 145 F.3d 691, 699–700 (5th Cir. 1998) (concluding that county sheriff possessed final policymaking authority with respect to "filling available employment positions in the sheriff's department" because Texas law provides that deputies "serve [] at the pleasure of the sheriff" (alteration in original) (quoting Tex. Loc. Gov't. Code Ann. § 85.003(c) (Vernon 1988))). Put differently, since it repealed its pre-existing personnel policies and enacted its current personnel ordinance, the Town Board has granted Bralley carte blanche authority to make "formal or informal *ad hoc* 'policy' choices or decisions." *Spell*, 824 F.2d at 1385. Bralley wielded such authority—free of any constraints on her discretion—when she terminated Plaintiffs in violation of the First Amendment.

The Town did not constrain Bralley's authority; indeed, the Town conceded that it has long since repealed all personnel policies that may have constrained Bralley's authority while declining to promulgate new ones. Moreover, the Town concedes that it maintained no formal review process for evaluating Bralley's termination decisions. In light of these concessions and the Town Board's express delegation of final policymaking authority to Bralley, we conclude that the circumstances surrounding Bralley's decision to terminate Plaintiffs present all the hallmarks of a final policymaker wielding her authority. *See, e.g.*, *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) ("Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to

30

meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." (internal quotation marks omitted)); *Thompson v. District of Columbia*, 832 F.3d 339, 348–50 (D.C. Cir. 2016) (explaining same); *Arendale v. City of Memphis*, 519 F.3d 587, 601–02 (6th Cir. 2008) (same); *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (same); *Williams v. Butler*, 863 F.2d 1398, 1402–03 (8th Cir. 1988) (en banc) (same).

Indeed, our sister circuits have held that municipal officials constitute final policymakers in materially indistinguishable circumstances. *See, e.g.*, *Valentino*, 575 F.3d at 677–78 (concluding Mayor of South Chicago Heights was final policymaker because local ordinances indicated the Mayor had "unfettered discretion" to hire and fire, defendant-municipality could not "point to any edicts from the board of trustees that in any way govern the manner in which [the] Mayor . . . may make his hiring or firing decisions," and record was devoid of "instances in which the board provided any meaningful oversight" of the Mayor's termination decisions); *Arendale*, 519 F.3d at 602 (concluding police chief possessed final policymaking authority with respect to plaintiff's suspension where the Memphis Police Department's policy manual gave the police chief authority to suspend plaintiff for ten days and "neither the Memphis Charter nor the Memphis City Code provide[d] for further review of [p]laintiff's suspension"); *Flanagan v. Munger*, 890 F.2d 1557, 1568–69 (10th Cir. 1989) (concluding police chief was final policymaker—notwithstanding the fact that the municipal code granted the City Manager the ability to set aside any action taken by police chief—because the code granted the chief shared authority over management and supervision of the police department, the

31

code "d[id] not create mandatory or even any formal review of departmental actions," and "for all intents and purposes the [c]hief's discipline decisions [we]re final, and any meaningful administrative review [wa]s illusory"); *Williams*, 863 F.2d at 1402–03 (holding the City of Little Rock liable for the unconstitutional discharge of a municipal court clerk by a municipal judge because the judge had been delegated "*carte blanche* authority" as to employment matters in his court, the judge's authority was not constrained by other final policymakers, and "[u]nlike the plaintiff in *Praprotnik*, [the court clerk] had no internal avenues of appeal available to challenge her termination").[9]

To hold otherwise would insulate the Town from liability in virtually every case—a result contrary to the principles underlying Section 1983. If a municipality, like the Town, could expressly delegate to a municipal official the unfettered authority to make *all* employment decisions (excepting the award of "fringe benefits") without constraining whatsoever the official's exercise of that authority, then that municipality would have the ability to effectuate employment policy without incurring the risk of liability for any unconstitutional policies the official may effect on its behalf. The Supreme Court has rejected such a result:

---

[9] We note that—in addition to the formal delegation of policymaking authority by the Town Board—the lack of *any* personnel policies promulgated by the Town Board and the lack of *any* formal review process are what cleanly separate the facts in this case from the facts in *Praprotnik*, in which the City of St. Louis "established an independent Civil Service Commission and empowered it to review and correct improper personnel actions" in light of the existing personnel policies established by the city, *see Praprotnik*, 485 U.S. at 128–29.

> [S]pecial difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official. If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability. *If, however, a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.*

*Praprotnik*, 485 U.S. at 126 (emphasis added) (citation omitted). If Bralley is not the final policymaker for the Town with respect to personnel policy, and the Town has no personnel policies on the books, then who *is* the final policymaker? And whose policies have governed the employment relationship between the Town and its employees for the past several decades? To hold that Bralley is not a final policymaker with regard to the termination of Plaintiffs would, in effect, mean that the Town had *no* policymakers with regard to those personnel decisions, because the Town Board has delegated final policymaking authority to Bralley, does not routinely review personnel decisions made by Bralley, and has not maintained any personnel policies for at least three decades. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 744 (6th Cir. 2005) ("If Chief Streicher is not the final policymaker as it pertains to demoting Barnes, it would appear no one has such authority."). Such a conclusion would sanction and encourage "egregious attempts by local governments to insulate themselves from liability for unconstitutional policies," *Praprotnik*, 485 U.S. at 127. This cannot be so.

## C.

Notwithstanding the Town Board's express delegation of authority to Bralley over employment matters—and the authority to terminate employees, like Plaintiffs, in

33

particular—Defendants argue that Bralley lacked final policymaking authority regarding the conduct at issue for three reasons: (1) attributing Bralley's action to the Town would impermissibly subject the Town to *respondeat superior* liability; (2) treating Bralley as a final policymaker with regard to Plaintiffs' terminations would contradict this Court's decisions in *Greensboro Professional Fire Fighters Association, Local 3157 v. City of Greensboro*, 64 F.3d 962 (4th Cir. 1995), and *Crowley v. Prince George's County*, 890 F.2d 683 (4th Cir. 1989); and (3) the Town Board retained authority under state law to rescind the ordinance conferring on Bralley authority over employment matters. We reject each argument.

First, under the common law doctrine of *respondeat superior*, a plaintiff-employee seeks to "impos[e] liability on an employer for the torts of an employee when the *sole nexus* between the employer and the tort is the fact of the employer-employee relationship." *Monell*, 436 U.S. at 693 (emphasis added). That doctrine has no relevance to this case because our holding does not rest on the mere existence of an employer-employee relationship between the Town and Bralley. Rather, our holding rests on the Town Board's express delegation to Bralley of final policymaking authority regarding personnel matters, rendering her termination of Plaintiffs the official policy of the Town. Put differently, the employer-employee relationship is *not* the "sole nexus" between the Town and Plaintiffs' unconstitutional terminations. *Id.*

Second, neither *Greensboro Professional Fire Fighters Association* nor *Crowley* supports Defendants' position. In *Greensboro Professional Fire Fighters Association*, we rejected a plaintiff-firefighter's bid to hold the City of Greensboro liable for the acts

of the city's fire chief, who allegedly denied the plaintiff a promotion in retaliation for the plaintiff's activities on behalf of a new firefighter's union. 64 F.3d at 963–64. In denying the plaintiff relief, we observed that whereas the fire chief possessed final authority to make promotional *decisions*, "[t]he relevant state and city laws point to one conclusion, however: In the City of Greensboro *only* the City Manager and the City Council possess the authority to fashion *policy* with regard to employer-employee relations in all city departments." *Id.* at 965 (second emphasis added). As a result, we concluded that the fire chief's decisionmaking authority was at all times constrained by the policies adopted by the City Council and City Manager—the final policymakers for the city. *Id.* Put differently, the fire chief's "power to appoint and to establish procedures for making appointments was *always* subject to the parameters established by the City." *Id.* at 965–66 (emphasis added). And in fact, the record in that case "show[ed] that the City Manager had adopted an official policy of neutrality toward the union activities of city employees." *Id.* at 966. Accordingly, in basing his promotional decision on the plaintiff-firefighter's involvement with unions, the fire chief was not *creating* employment policy for the city, he was acting *contrary* to established policies set forth by the city's final policymakers. *Id.*

Similarly, in *Crowley* we concluded that a county police chief's decision to downgrade the salary level of one of his employees, allegedly on account of the employee's race, could not expose the county to municipal liability under Section 1983. 890 F.2d at 684. We explained that the police chief lacked final policymaking authority for personnel decisions because the county's charter expressly stated that the county

council "*shall* provide by law for a personnel system governing the appointment and removal of employees, and other personnel procedures for employees in the [c]ounty government," and "dictate[d] that all personnel decisions be based on merit and fitness." *Id.* at 686 (emphasis added). Consequently, although the county police chief possessed the authority to make certain personnel decisions, the *policies* promulgated by the county council circumscribed his discretion in making those decisions. *Id.* at 686–87. In other words, because the police chief allegedly based the challenged employment decision on a factor other than merit and fitness, he was not *creating* new policy for the county, he was acting *contrary* to policy already established by the county council.

Unlike in *Greensboro Professional Fire Fighters Association*, in which "[t]here [wa]s no evidence in the record" that policymaking authority had been delegated to the fire chief, 64 F.3d at 965, and *Crowley*, in which "[t]here exist[ed] not one hint of evidence . . . that policymaking authority over personnel matters was delegated to the police chief," 890 F.2d at 686, in this case the Town Board expressly delegated to Bralley full policymaking authority. *See supra* Part III.B. The Town's local ordinance provides as much, stating that all "*terms* of the [Town personnel] positions" were "*at the will* of the Town Manager." Mocksville, N.C., Code of Ordinances § 2-4.1 (emphases added). Notably, in the ordinance, the Town Board reserved the right to approve policies relating to "fringe benefits" only —further indicating that Bralley was authorized to "make *final* policy" with respect to all other personnel matters. *Praprotnik*, 485 U.S. at 127. And here—unlike the purported policymakers in *Greensboro Professional Fire Fighters Association* and *Crowley*—Bralley's policymaking authority with respect to the conduct

36

at issue was not constrained by any policies of the Town. Accordingly, *Greensboro Professional Fire Fighters Association* and *Crowley* support, rather than undermine, our conclusion that Bralley was a final Town policymaker with regard to the conduct at issue.[10]

Third, that the Town Board may have retained the authority to rescind its ordinance delegating plenary authority over personnel policy to the Town Manager does not in any way undermine our conclusion that Bralley's actions can be fairly attributed to the Town. Rather, we have previously explained that "a municipal agency or official may have final authority to make and implement policy despite a municipality's retention of powers of ultimate control over both policy and policymaker." *Spell*, 824 F.2d at

---

[10] During oral argument, the Town argued for the first time on appeal that state law prohibits the delegation of final policymaking authority to town managers. *See* Oral Argument at 40:55–42:20. We find this proposition meritless. For one thing, this argument is foreclosed by our prior opinion in *Greensboro Professional Fire Fighters Association*, in which we recognized that town managers in North Carolina may be final policymakers for purposes of municipal liability under Section 1983. *See* 64 F.3d at 965. North Carolina courts also have recognized the valid delegation of final policymaking authority to town managers with respect to personnel policies. *See, e.g., Lambert v. Town of Sylva*, No. COA17-84, 2018 WL 2011529, at *7 (N.C. App. Ct. May 1, 2018).

Even if *Greensboro Professional Fire Fighters Association* did not foreclose the Town's argument, the Town fails to explain how its contention that state law bars the Town Board from delegating its policymaking authority is consistent with the plain language of North Carolina General Statute Section 160A-164, which uses the permissive term "may"—indicating the North Carolina General Assembly's intent to provide town councils with the *ability* to create personnel policy, not a *command* for them to do so. Additionally, the Town's argument is inconsistent with Section 160A-148, which provides that town managers, such as Bralley, "shall perform *any other duties* that may be required or *authorized* by the council." N.C. Gen. Stat. § 160A-148 (emphases added). The Town's delegation of policymaking authority to Bralley fits comfortably within the parameters of Sections 160A-164 and 160A-148.

1386. In such circumstances, "[t]he question is one of authority-in-fact." *Id.* "A municipal governing body may not avoid attribution of policy to itself simply by officially retaining *unexercised ultimate authority* to countermand a policy or to discipline or discharge [a] policymaker." *Id.*; *see also Liverman*, 844 F.3d at 413 ("An entity has 'final' authority to set this sort of policy when no further action is needed for the policy to take effect. . . . Here the fact that Dixon serves 'under the direction and control of the city manager' does not necessarily establish that he lacked final authority to promulgate the policy whose validity has been successfully challenged herein.").

Here, the Town Board chose to confer on Bralley unfettered final policymaking authority with respect to almost all personnel matters—including terminations. *See* Mocksville, N.C., Code of Ordinances § 2-4.1. The Town made no effort to constrain or limit that delegation. And, as a matter of custom, Bralley exercised that delegated authority without oversight by the Board. Accordingly, the Town Board's "unexercised ultimate authority" to rescind its ordinance conferring such authority does not undermine our conclusion that Bralley constituted a final policymaker of the Town with regard to the conduct at issue—the unlawful termination of Plaintiffs.

## D.

Finally, although we hold that Bralley, as Town Manager, was a final municipal policymaker with regard to the conduct at issue, we agree with the district court's conclusion that Cook, as Police Chief, was not. In particular, we find that Justice Brennan's hypothetical in *Pembaur* illustrates precisely why Bralley *is* a final policymaker for the Town with respect to establishing personnel policies, and why Cook

38

*is not*: Because the Town Board "delegated its power to establish final employment policy to the [Town Manager], the [Town Manager's] decisions . . . represent [Town] policy and could give rise to municipal liability." *Pembaur*, 475 U.S. at 483 n.12. But although Cook, as Police Chief, "may have *discretion* to hire and fire employees," *id.* (emphasis added), "[t]he discretion to hire and fire does not necessarily include responsibility for establishing related policy," *Greensboro Prof'l Fire Fighters Ass'n*, 64 F.3d at 966. And here the record is replete with evidence demonstrating that Cook's personnel decisions were always subject to review by Bralley. *See* J.A. 93, 111–12. Plaintiffs concede as much in their briefs. *See* Appellants' Br. at 38. Accordingly, we conclude that Cook was not a final policymaker for the Town with respect to personnel policy.

\* \* \* \* \*

In sum, we conclude that although Cook was not a final policymaker of the Town regarding Plaintiffs' terminations, Bralley was a final policymaker. Accordingly, we reverse the district court's dismissal of Plaintiffs' First Amendment claims against the Town and remand with instructions to enter judgment in favor of Plaintiffs on these claims.

## IV.

Lastly, Plaintiff Medlin contends that the district court reversibly erred by denying his request for reinstatement or, in the alternative, an increase in front pay. We review a district court's decision to award or deny equitable relief, like reinstatement or an award

39

of front pay, for abuse of discretion. *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 299 (4th Cir. 2009). A district court "abuses its discretion only if its conclusions are based on mistaken legal principles or clearly erroneous factual findings." *Id.* (citation omitted).

Medlin contends that the district court should have ordered him reinstated to his former position at Mocksville PD because the "primary obstacle to [his] reinstatement"—Bralley's continued employment by the Town—is no longer present, given Bralley's retirement. Appellants' Br. at 48. Alternatively, Medlin contends that the district court abused its discretion when it granted Medlin 1.75 years of front pay instead of the 13.75 years of front pay recommended by the jury. In Medlin's view, the district court's award is "clearly inadequate, . . . arbitrary, unsupported by the law, and inconsistent with the [district] court's own analysis." *Id.* at 51. We disagree with both contentions.

After a finding of wrongful discharge, reinstatement, not front pay, is the preferred equitable remedy. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1423 (4th Cir. 1991). However, "notwithstanding the desirability of reinstatement, intervening historical circumstances can make [reinstatement] impossible or inappropriate." *Id.* For example, we have recognized that courts have reasonably declined to award reinstatement when "the employer has demonstrated such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible." *Id.* (citation omitted). "Reinstatement has also been found inappropriate when the litigation itself created such animosity between the parties that any potential employer-employee relationship was irreparably damaged." *Id.* Thus, although reinstating a wrongfully discharged employee is preferred to engaging in the inherently "speculative venture" of

40

calculating front pay, in appropriate circumstances a district court may award front pay in lieu of reinstatement. *Id.*

Here, the district court denied Medlin's request for reinstatement because Medlin's "relationship with the MPD . . . has only deteriorated" since his termination, as evidenced by two social media posts that Medlin made on August 28, 2016 and November 13, 2016. *Hunter*, 237 F. Supp. 3d at 355. In those posts, Medlin stated that Mocksville was a "crooked [expletive] hole of a town," and "questioned law enforcement's actions as to an active investigation." *Id.* Thus, the district court's denial of Medlin's request for reinstatement reflects the consideration of a recognized barrier to reinstatement—specifically, continued hostility between the parties, *see Uniroyal Inc.*, 928 F.2d at 1423—and is supported by undisputed record evidence. The district court also emphasized the elevated need for trust among law enforcement department personnel. *See Kelley v. Johnson*, 425 U.S. 238, 246 (1976) (recognizing a police department's interest in "discipline[,] esprit de corps, and uniformity"). Accordingly, the district court did not abuse its discretion in denying Medlin's request for reinstatement.

We also conclude that the district court did not abuse its discretion when it granted Medlin 1.75 years of front pay instead of the amount recommended by the jury. The purpose of awarding front pay is to provide resources to a wrongfully terminated plaintiff "to complement a deferred order of reinstatement or to bridge a time when the court concludes the plaintiff is reasonably likely to obtain other employment." *Uniroyal*, 928 F.2d at 1424. At the same time, we have cautioned that because of the "speculative"

41

nature of front-pay awards and "the potential for windfall," the use of front pay "must be tempered." *Id.* at 1423–24.

In calculating Medlin's front-pay award, the district court first correctly observed that "[t]here is no bright line test for awarding front pay." *Hunter*, 201 F. Supp. 3d at 758; *see also Uniroyal*, 928 F.2d at 1424 (recognizing that due to "[t]he infinite variety of factual circumstances that can be anticipated[,] . . . front pay [is not] susceptible to legal standards for awarding damages."). Notwithstanding the absence of a bright-line test, the district court considered several non-exclusive factors routinely considered by other courts. *Hunter*, 201 F. Supp. 3d at 758–59; *see also Ogden v. Wax Works, Inc.*, 29 F. Supp. 2d 1003, 1013–15 (N.D. Iowa 1998) (collecting cases). These factors include the plaintiff's age; the length of plaintiff's employment with the defendant-employer; the likelihood that plaintiff's employment would have continued absent the discrimination; the length of time it would take plaintiff to secure comparable employment using reasonable efforts; plaintiff's work and life expectancy; the typical length of time other employees held the position lost; plaintiff's status as an at-will employee; plaintiff's ability to work, including the ability to work for the defendant-employer; plaintiff's subjective intention to remain in the position; and plaintiff's efforts to mitigate damages. *Hunter*, 201 F. Supp. 3d at 758–59.

The district court then applied these factors to the facts of this case. In particular, the district court concluded that although Medlin's tenure and likelihood of continued employment—including the length of time other employees typically held the position lost and Medlin's subjective intent to continue employment—weighed in favor of a front-

42

pay award, his age (forty-four years old) and work-life expectancy weighed against an "extended front pay award." *Id.* at 762–64. Additionally, the district court concluded that Medlin's "prospects of obtaining comparable employment moving forward are good," given the interest he received from two police departments early on in his job search, and in light of the fact that the jury verdict in his favor removed "any cloud over his reputation as a result of his termination and this litigation." *Id.* at 764.

We conclude that the district court reasonably exercised its discretion in calculating Medlin's front-pay award. The district court adverted to our instruction that the calculation of front pay necessarily "requires an analysis of all the circumstances existing at the time of trial." *Id.* at 758 (quoting *Uniroyal*, 928 F.2d at 1423). The district court then analyzed a variety of pertinent factors and drew reasonable conclusions. *See Dotson*, 558 F.3d at 300 (affirming district court's denial of fifteen-year front pay award based on, among other factors, the plaintiff's "relatively young age when terminated"); *see also Peyton v. DiMario*, 287 F.3d 1121, 1128–30 (D.C. Cir. 2002) (holding district court's award of twenty-six years of front pay to a thirty-four-year-old plaintiff was abuse of discretion).

That the jury recommended a larger front-pay award does not undermine the reasonableness of the district court's determination. As the district court correctly noted, an advisory verdict "is of no binding legal significance." *Hunter*, 201 F. Supp. 3d at 757 (quoting 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2335 (3d ed. 2008 & Supp. 2016)). Likewise, we have long recognized that front pay "is an equitable remedy best determined by the district court rather than the jury." *Cline*

43

*v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 307 (4th Cir. 1998). In such circumstances, the district court did not abuse its discretion in awarding Medlin 1.75 years of front pay.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS.*

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

Judge Wynn's opinion has thoroughly analyzed the liability of the Town of Mocksville under 42 U.S.C. § 1983 for the nearly $2 million judgment entered pursuant to the jury's verdict, concluding that the Town conferred policy-making authority on the Town Manager that covered the personnel actions taken by her and the Chief of Police, and I am pleased to concur in Parts III and IV of his opinion. In Part II, however, the opinion reverses the district court's conclusion that the Town's coverage under its insurance policy was limited to $1 million. The opinion concludes that because the policy was ambiguous in defining the limit of coverage, it should be construed to provide the Town with $3 million in coverage in this case, the policy's annual aggregate coverage limit. I cannot agree that the policy is ambiguous, and therefore I would affirm the ruling of the district court limiting the Town's coverage to $1 million.

The Town of Mocksville purchased an employment-practices liability insurance policy from the Interlocal Risk Financing Fund of North Carolina that provided coverage of $1 million for each applicable claim against the Town and an aggregate limit for all such claims in one year of $3 million.

On appeal, the plaintiffs contend that "[w]hile the claims of a single individual for the 'same or interrelated acts of [the defendants]' could be combined" under the each-claim limit, "the policy language chosen by [the insurer] d[id] not permit the combining of claims of multiple persons." As such, they argue, "the interrelated acts of [the defendants] *as to each officer* meant *each officer* was subject to" the policy's $1 million each-claim limit, for a total of $3 million, the aggregate annual limit. The majority

45

opinion suggests that the policy language is ambiguous, based on how other courts have interpreted the term "interrelated" in other insurance policies and how the policy in this case defines "related," and it therefore agrees with the plaintiffs and reverses the district court.

A fair reading of the policy, however, can only lead to the conclusion that the claims of the plaintiffs in this case amount to a "single claim," as defined in the policy, with a single $1 million limit.

In the declarations section, the policy provides $1 million in coverage for each claim and $3 million in coverage as an annual aggregate limit for all claims, with each claim subject to a $5,000 deductible. A claim is defined as a "demand received by the insured" or a suit or arbitration filed against the insured. And the insured is defined to be the Town of Mocksville and its elected officials and employees for their acts "within the course and scope of their duties." Detailing how the $1 million limit is to be applied to a claim, the policy provides:

> The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay *regardless of the number of . . .* [*p*]*ersons or organizations* making "claims" or bringing "suits". . . . [T]he Each Claim Limit is the most we will pay for all loss arising out of any "employment wrongful act(s)" covered by this policy. *"Claims" based on and arising out of the same act or interrelated acts of one or more insureds shall be considered to be a single "claim".*

(Emphasis added). Similarly, in defining a claim for purposes of applying the deductible amount to each claim, the policy provides, "'Claims' based on or *arising out of the same act or interrelated acts of one or more insureds shall be considered a single 'claim'.*"

(Emphasis added).

46

In short, the policy provides $1 million in coverage for each claim, which it unambiguously defines as the filing of a suit against or a demand for money damages from the Town of Mocksville and its employees. And it makes absolutely clear that all "[c]laims based on and arising out of the same act or interrelated acts of one or more insureds," "*regardless of the number of . . . [p]ersons or organizations making 'claims' or bringing 'suits,'*" are to be treated *as* "*a single 'claim'.*" (Emphasis added).

In this case, the three plaintiff police officers collectively made a single telephone call on December 14, 2011, to the North Carolina Governor's Office about the inappropriate conduct of their chief. As a result of that call, the three officers' employment was terminated on the same day two weeks later by the Chief with the approval of the Town Manager. The plaintiffs claimed and the jury found that their termination was wrongful because it was done in retaliation for their call to the Governor's Office, in violation of their First Amendment right of free speech.

Under any fair reading of the policy, the officers' claims constituted a "single claim" as defined in the policy. While the liability of the defendants is based on three wrongful terminations, the terminations were approved collectively by the Town Manager for the single purpose of retaliating against the plaintiffs for their joint act of making the telephone call. Thus, the acts of terminating the plaintiffs' employment were "interrelated," as that term is ordinarily understood, because they were related to each other by their common connection — *i.e.*, their mutual relationship — to the single telephone call and the defendants' single purpose of retaliating against the plaintiffs for that call. *See, e.g.*, *Webster's Third New International Dictionary* 1182 (1993) (defining

47

"interrelated" as "having a mutual or reciprocal relation or parallelism"). Indeed, it is difficult to imagine a reasonable meaning of interrelated that would not encompass the defendants' conduct in this case. Accordingly, under the policy's plain terms, the three terminations gave rise to a "single claim" despite the fact that the plaintiffs asserted a "number of . . . [c]laims" and that they constituted a "number of [p]ersons or organizations making [the] 'claims' [and] bringing 'suits.'" Therefore, the $1 million limit, with the $5,000 deductible, applies to that single claim.

Ignoring the policy's language defining as a "single claim" all claims arising out of interrelated wrongful acts, *regardless of the number of claims* in the suit *or the number of persons* making them, the majority finds ambiguity in the coverage based on the fact that other courts interpreting the word "interrelated" within a policy definition have not defined that term "in a uniform manner." *Ante* at 18. And to further support its conclusion, the majority also seeks to define the undefined term "interrelated" by the term "related" as used elsewhere in the policy in a different context. At bottom, the majority reaches the conclusion that the term "interrelated" must be ambiguous and therefore should be read not to encompass claims *brought by different individuals*, as the plaintiffs urge. But that conclusion is explicitly foreclosed by the policy's language, which defines as a "single claim" all claims arising from the same act or interrelated acts brought by *any number of persons*, "*regardless of the number*."

In contriving ambiguity for this policy, the majority fails to take heed of North Carolina law, which instructs that when a policy does not provide a definition, "nontechnical words are to be given a meaning consistent with the sense in which they

48

are used in ordinary speech, unless the context clearly requires otherwise." *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970) (citation omitted). In *Wachovia Bank*, the North Carolina Supreme Court further explained that ambiguity does not exist unless "the language of the policy is fairly and reasonably susceptible to *either of the constructions for which the parties contend*" and that courts may not, "under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay." *Id*. (emphasis added). Here, the construction advocated by the plaintiffs — that the claims of multiple individuals cannot be combined — is expressly foreclosed by the policy.

At bottom, the three plaintiffs in this case jointly made a telephone call to the Governor's Office, and for that conduct, the three were fired in violation of the First Amendment. It could not be clearer that the claims of the three officers are to be treated under the policy as a single claim for which the policy limits coverage to $1 million, less the $5,000 deductible.

For these reasons, I would affirm the district court's construction of the policy.